## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT HENDRY, | Case No.: 3:16-cv-08851 (PAZ) |
| Plaintiff, | **OPINION** |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**APPEARANCES:**

SHERYL GANDEL MAZUR
195 FAIRFIELD AVENUE
SUITE 2C
WEST CALDWELL, NJ 07006
    On behalf of Plaintiff

COREY STEPHEN FAZEKAS
SOCIAL SECURITY ADMIN.
300 SPRING GARDEN STREET
SIXTH FLOOR
PHILADELPHIA, PA 19123
    On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Robert Hendry for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401, et seq.).

Plaintiff appeals from the final decision of the Administrative Law Judge ("ALJ") denying the

application; Defendant, the Commissioner of Social Security ("the Commissioner"), opposes

Plaintiff's appeal. After careful consideration of the record, including the ALJ hearing transcripts,

the ALJ's prior decision, and the pleadings, memoranda, and oral arguments by the parties, the Court decides this matter pursuant to Rule 78(a) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f). For the reasons set forth below, the Court remands the case to the Commissioner in accordance with the following instructions.

## I.    PROCEDURAL HISTORY

On September 24, 2012, Plaintiff protectively filed an application for DIB alleging a disability onset date of December 7, 2011. (R. 193-99.)[1] On April 2, 2013, the Commissioner determined that Plaintiff was not disabled and denied the application. (R. 124-41.) Plaintiff filed for reconsideration, and his application was again denied on August 8, 2013. (R. 149-51.)

On February 24, 2015, an Administrative Law Judge held a hearing on Plaintiff's application; Plaintiff was represented by counsel at the hearing. (R. 58-122.) On May 15, 2015, the ALJ issued a decision again denying Plaintiff's application. (R. 34-57.) On October 7, 2016, the Appeals Council denied Plaintiff's request for appeal (R. 1-6), thereby affirming the ALJ's decision as the "final" decision of the Commissioner.

On November 29, 2016, Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3). ECF No. 1. On April 18, 2018, Plaintiff consented to have a U.S. Magistrate Judge conduct all further proceedings in the case to disposition pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF No. 28.[2] The case was reassigned to the undersigned Magistrate Judge on April 19, 2018. On May 9, 2018, the Court

---

[1] "R." refers to the continuous pagination of the administrative record. ECF No. 11.

[2] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

heard oral arguments from both parties during a non-evidentiary hearing. Both parties submitted supplemental briefing as requested by the Court. ECF Nos. 33, 34, 36.

## II.  LEGAL STANDARD

### A.  <u>Standard of Review</u>

This Court has plenary review of legal issues decided by the ALJ in reviewing applications for DIB. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g) & 1383(c)(3). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309 (JLL), 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018). Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *see K.K.*, 2018 WL 1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its

conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Coleman*, 2016 WL 4212102 at *3 (citing *Schonewolf*, 972 F. Supp. at 284-85) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978))).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of

the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter*, 650 F.2d at 482. Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984)). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016). A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and

entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518. In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays. *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000). An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits." *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

## B.     Standard for Awarding Benefits

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for DIB based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 404.1505(a). An impairment is "medically determinable" if it results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Thus, an impairment must be established by objective medical evidence from an acceptable medical source and cannot be established by a statement of symptoms, a diagnosis, or a medical opinion. *Id.* § 404.1521.

The process for determining an adult's claim for DIB involves a five-step sequential inquiry. 20 C.F.R. § 404.1520(a)(4).[3] The claimant bears the burden of proof at Steps One through

---

[3] In January 2017, a regulation was promulgated to govern the weight to be attributed to certain evidence submitted in claims filed after March 27, 2017. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017) (citing 20 C.F.R. § 404.1520(c) ("How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017.")). This case arises from a claim filed on September 24, 2012, and is therefore analyzed by this Court – as it was by the ALJ – under the prior regulation, now codified at 20 C.F.R. § 404.1527 ("Evaluating opinion evidence for claims filed before March 27, 2017.").

Four. At Step Five, the burden shifts to the Commissioner. *Id*. § 404.1512; *see Holley v. Colvin*, 975 F. Supp.2d 467, 476-77 (D.N.J. 2013), *aff'd sub nom. Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014). At each Step, the ALJ must consider the combined effect of all of the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step. 20 C.F.R. § 404.1523(c).

At Step One, the ALJ decides whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work activity that involves doing significant physical or mental activities and is usually done for pay or profit. *Id*. §§ 404.1572(a) & (b). If the claimant is engaging in such activity, then the inquiry ends because the claimant is not disabled.

"The [Step Two] inquiry is a de minimis screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). At this step, the ALJ decides whether the claimant has an impairment or a combination of such impairments that is severe. 20 C.F.R. § 404.1520(c). An impairment or combination of impairments is severe if it significantly limits a claimant's ability to perform basic work activities. An impairment or combination of impairments is not severe if the claimant has a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations. *Id*. § 404.1522. If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment(s) in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R.

§§ 404.1520(d), 404.1525, 404.1526. If the claimant's specific impairment is not listed, the ALJ will consider the most closely analogous listed impairment for purposes of deciding medical equivalence. *Id*. § 404.1526(b)(2). If the claimant has an impairment or combination of impairments that meets or medically equals a Listing, then the claimant is presumed to be disabled as long as the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. § 404.1509.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC"), determine the physical and mental demands of the claimant's past relevant work, and determine whether claimant has the level of capability needed to perform past relevant work. 20 C.F.R. §§ 404.1520(e) & (f). RFC is the claimant's maximum remaining ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. Past relevant work is work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the disability date. In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity. *Id*. §§ 404.1560, 404.1565. If the claimant's RFC enables her/him to perform past relevant work, then the claimant is not disabled.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, is capable of performing other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). If the claimant is incapable of doing so, then s/he is presumed to be disabled as long as her/his impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months. Otherwise, the claimant is not disabled.

In deciding the claimant's ability to perform other jobs that exist in significant numbers in the national economy, the ALJ must consider whether the claimant's impairment and symptoms result in exertional and/or non-exertional limitations. The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. §§ 404.1569a(a) & (b). Non-exertional limitations affect a claimant's ability to meet all other demands of a job (i.e., non-strength demands), including but not limited to difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching. *Id*. at § 404.1569a(c).

If the claimant has no non-exertional limitations and can perform all or substantially all exertion demands at a given level, then the ALJ must use the Medical-Vocational Rules (also referred to as "Grid") found at 20 C.F.R. § 404, Subpart P, Appendix 2. 20 C.F.R. § 404.1569a(b). The Grid reflects various combinations of RFC, age, education, and work experience and direct a finding of disabled or not disabled for each combination. If the claimant also has any non-exertional limitations or cannot perform substantially all of the exertional demands at a given level, then the Grid is used as a framework for decision-making unless there is a rule that directs a conclusion of disabled without considering the additional non-exertional or exertional limitations. *Id*. § 404.1569a(d). If the claimant has solely non-exertional limitations, then the Grid provides a framework for decision-making. *Id*. § 404.1569a(c).

## III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was fifty years old when he applied for DIB on September 24, 2012. (R. 49.) At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since

September 22, 2011, the alleged onset date. (R. 39.) At Step Two, the ALJ found that Plaintiff had the following severe impairments: left hemichorea; Tourette's syndrome; psychogenic movement disorder; carpal tunnel syndrome; lateral epicondylitis; mild cervical degenerative disc disease; status/post right thalamic infarction; affective disorder; anxiety disorder; obsessive compusive disorder. The ALJ also found at Step Two that Plaintiff's diabetes, cardiac, and back pain due to hip extension were not severe impairments. (R. 39-40.) At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of any Listing. (R. 40.) At Step Four, the ALJ found that:

> The [claimant] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can lift and carry 20 pounds occasionally and 10 pounds frequently. He can sit for six hours total in an eight-hour day. He can stand and/or walk for six hours total in an eight-hour day. He can occasionally use his left, non-dominant upper extremity. He can occasionally push with left lower extremity. He can never climb ladders, ropes or scaffolds. He can occasionally climb stairs, use ramps, stoop, kneel, balance, crouch and crawl. The claimant must be able to sit and stand at will. He can have no frequent exposure to extreme temperatures or hazards, including unprotected heights and moving machinery. He is capable of performing routine tasks and following short, simple instructions. He can make simple work-related decisions with few workplace changes. He can have no more than occasional interaction with the public, coworkers and supervisors.

(R. 42.) The ALJ also found at Step Four that Plaintiff was unable to perform his past relevant work as an appointment clerk or claims examiner. (R. 49.) At Step Five, the ALJ found, based in part on VE testimony, that Plaintiff was capable of making a successful adjustment to other work – visual inspector, hand packager, or bench assembler – that exists in significant numbers in the national economy. The ALJ concluded that "[t]he claimant had not been under a disability, as defined in the Social Security Act, from September 22, 2011, through the date of this decision." (R. 50.)

Plaintiff initially contends that the ALJ's decision should be reversed and remanded under 42 U.S.C. 405(g) pursuant to sentence four because the ALJ: (1) erred at Step Three by concluding

that Plaintiff's impairments did not meet or medically equal a Listing; (2) improperly evaluated Plaintiff's subjective complaints; (3) improperly evaluated the hearing testimony provided by Plaintiff's father; and (4) erred at Step Five by failing to establish that Plaintiff can perform other work in the national economy. Plaintiff next contends that, "even in the event this case is not remanded pursuant to sentence four … it should at the least be remanded pursuant to [sentence six]" based on new evidence provided to but rejected by the Appeals Council. ECF No. 20 at 15. Plaintiff lastly contends that "[a] dual basis remand is also appropriate[.]" *Id.*

Defendant contends that the ALJ's decision should be affirmed in its entirety because it reflected correct application of the governing legal standards; careful consideration of the entire record; and sufficient explanation for, and substantial evidence supporting, the finding that Plaintiff was not disabled during the relevant period.

## IV.    RELEVANT MEDICAL EVIDENCE

### A.    <u>Prior To ALJ Hearing</u>

In November 2011, Plaintiff complained about sudden involuntary shaking and extension of his left leg. He was diagnosed by one of his primary care physicians from Delaware Valley Family Health Center with a sprain/strain of the left thigh.[4] In December 2011, Plaintiff again complained to his primary care physicians about involuntary left leg movements that occurred while sitting, lying in bed, and driving a car. He was prescribed medication for restless leg syndrome. (R. 370-74.)

---

[4] In April 2009, March 2010, and July 2011, Plaintiff referred himself for intensive outpatient mental health treatment through the acute partial hospital program at Hunterdon Medical Center and was diagnosed with major depressive disorder, recurrent major depression (severe without psychotic features), obsessive compulsive disorder, generalized anxiety disorder, and panic disorder (without agoraphobia). (R. 300-21.)

In January 2012, Plaintiff went to St. Luke's Warren Hospital because he was not getting relief from the medication. Although the emergency room physicians observed intermittent shaking of his left leg, Plaintiff was not admitted. He was diagnosed with muscle spasms and restless leg syndrome. (R. 447-54.)

Beginning in May 2012, Plaintiff was treated for depressive disorder, obsessive compulsive disorder, panic disorder, mood disorder, anxiety disorder by Dr. Abdo G. Saba (psychiatrist) from Family Guidance Center.[5] Dr. Saba's treatment notes reflect that on several visits in 2012, he observed abnormal motions and stiffness in Plaintiff's left leg that were consistent with Plaintiff's physical complaints. After adjusting Plaintiff's medications to rule out the possibility that side effects were causing Plaintiff's movement issues, Dr. Saba encouraged Plaintiff to see a neurologist. (R. 335-51).

In August 2012, Plaintiff complained to his primary care physicians at Delaware Valley Medical Health Center about worsening shaking in his left leg. Treatment notes reflect observation of left leg tremors that were diagnosed as a "[l]ikely component of OCD and tic disorder." In September 2012, an MRI of Plaintiff's brain revealed a chronic right thalamic infarction. In October 2012, one of Plaintiff's primary care physicians completed a disability form entitled General Medical Report. The responding physician crossed out the exertional limitation section and, in response to a question asking whether other conditions limited Plaintiff's ability to do work related activities, handwrote "psychiatry – dep – OCD get info from his psychiatrist Dr. Saba." (R. 352-93.)

---

[5] From January 2011 through March 2012, Plaintiff was treated for obsessive compulsive disorder by Dr. Gerard A. Machado (psychologist) from Affiliates in Clinical Service. Dr. Machado's treatment records do not reference Plaintiff's physical complaints. (R. 322-34.)

In December 2012, Plaintiff complained to Dr. Saba about increasing stiffness on his left side that adversely affected Plaintiff's ability to drive, and Dr. Saba observed tremors on Plaintiff's left side. (R. 484-504.) Also in December 2012, Plaintiff sought treatment with Dr. Donald T. Pennett (neurologist) for involuntary left leg extension and loss of balance. Dr. Pennett ordered a transthoracic echocardiogram, lumbosacral spine x-rays, and a head/neck CT scan. The results of all three tests were normal. Dr. Pennett examined Plaintiff again in January 2013 and ordered a brain CT scan and left elbow x-rays. The CT scan revealed a chronic lacunar infarct right thalamus, but the x-rays did not reveal any significant abnormality. (R. 403-09, 459-75.)

In March 2013, Plaintiff sought treatment with Dr. Todd R. Garber (neurologist) from Riverfront Neurology. Plaintiff explained that in October 2011, he suffered the sudden onset of involuntary shaking of his left leg while seated. Around the same time, Plaintiff noticed involuntary extension of his left lower leg such that he was unable to drive. Although these involuntary movements did not initially interfere with his walking, Plaintiff's ability to walk slowly and gradually worsened such that by early 2013, Plaintiff began to experience pain, numbness, and tingling in his left upper arm that radiates down the forearm into his fingers. Dr. Garber agreed that Plaintiff's September 2012 brain MRI and January 2013 brain CT scan revealed a chronic lacunar infarct in the right thalamus. Dr. Garber observed frequent, involuntary movements of Plaintiff's head and neck, and that Plaintiff's gait seem embellished. Dr. Garber diagnosed Plaintiff with abnormal involuntary head/neck movements most likely secondary to Tourette's syndrome and abnormal gait. (R. 476-83.)

In April 2013, Dr. Garber conducted an EMG of Plaintiff's left upper arm and additionally diagnosed Plaintiff with carpal tunnel syndrome. Plaintiff was advised to wear a wrist brace at night and provided a referral to Dr. Nicholas Avallone (orthopedic surgeon) with St. Luke's

Orthopedics. Dr. Garber also reviewed the results of a second brain MRI performed on April 12, 2013, which revealed a chronic right thalamic infarction and an area of decreased signal intensity in the cervical spinal cord on the sagittal TI imaging. Dr. Garber opined that Plaintiff's abnormal movements in his left leg and arm might be secondary to a post stroke phenomenon, while the abnormal movements in his face were more suggestive of Tourette's syndrome. (R. 505-14.)

In May 2013, Dr. Saba "highly advised" Plaintiff "to follow up with a different neurologist if he finds that the one he has is not helpful enough. Patient has organic problems that are making him restless, shaky, tremulous and stiff and needs to get help and get to the base of it." (R. 520-25.)

In June 2013, Plaintiff complained to Dr. Garber that his walking was getting worse and that he had needed to use a cane during the preceding two weeks. Plaintiff also complained about worsening of left leg stiffness and involuntary movements that caused constant discomfort. Dr. Garber referred Plaintiff to Dr. Roger Kurlan (neurologist) from Overlook Medical Center. (R. 515-19.) Also in June 2013, Dr. Saba "highly recommend[ed]" that Plaintiff "go as soon as possible to [Dr. Kurlan] and try to find out the most effective way to help him with his neurological disorder." (R. 520-25.)

On June 10, 2013, Dr. Marvin Blase, M.D. completed a Medical Consultant's Review of Psychiatric Review Technique Form and disagreed with the functional limitations preliminarily assessed by DDS. Dr. Blase opined that:

> [B]efore adjudication the DDS needs to obtain an updated psych hx and particularly a MSE [mental status exam] which contains valid and reliable measures of attention concentration and memory functioning. Additionally the DDS needs to obtain third party cross hx and functional date for further delineation of his psych from his medical related limitations.

(R. 526-31.)  On June 11, 2013, Dr. Michael T. Fleming, M.D. completed a Medical Consultant's Review of Physical Residual Functional Capacity assessment in which he agreed with the physical limitations preliminarily assessed by DDS.  (R. 532-33.)

On July 23, 2013, consultative physician Dr. Alan Radzin (psychologist) examined Plaintiff.  Dr. Radzin reported that Plaintiff drove himself to the exam but used a cane, was very unsteady on his feet, had an unbalanced looking gait, and appeared as if he might fall.  Plaintiff was examined in a first-floor office instead of climbing to Dr. Radzin's second floor office.  Dr. Radzin opined that extreme shakiness and tic-like facial movements indicated that Plaintiff "came across as having a Dysthymic Disorder" and additionally "appears to have a neurological disorder stemming from a potential stroke and Tourette's Syndrome.  This is based on not only information given by the claimant, but medical records available to the Examiner from his neurologist."  (R. 535-38.)

On July 30, 2013, DDS determined – as to Listing 12.02 (Organic Mental Disorders), Listing 12.04 (Affective Disorders), and Listing 12.06 (Anxiety Disorders) – that Plaintiff was mildly limited as to daily living activities and moderately limited in both social functioning and concentration, persistence, and pace.  DDS further determined that Plaintiff could perform light work subject to various postural and environmental limitations.  (R. 124-41.)

By letter to Dr. Garber dated October 1, 2013, Dr. Kurlan advised:

> [Plaintiff's] findings are most indicative of tardive dyskinesia and tardive akathisia related to his use of Risperdal.  I reviewed the brain MRI with one of our stroke specialists and we are not convinced that there is evidence of a thalamic stroke.  You or his psychiatrist might consider trying tetrabenazine.[6]

---

[6] Tardive akathisia is a subjective disorder characterized by a desire to be in constant motion resulting in an inability to sit still and a compulsion to move.  Tardive dyskinesia is an involuntary movement disorder characterized by repetitive purposeless movements.  *See* https://www.ncbi.nlm.nih.gov/pubmed/6139392/.

(R. 571.)

In January 2014, Plaintiff advised Dr. Garber that: tetrabenazine was not helping Plaintiff's involuntary movements; his gait was getting worse; he was unable to sit, stand, or walk; his left arm was constantly flexing; his left leg had constant stiffness; he had significant pain in his left elbow from involuntary flexion of his left arm; and the only position in which he was comfortable was kneeling, with kneeling on the bed being better than kneeling on the floor. Dr. Garber again referred Plaintiff to Dr. Avallone; Plaintiff was also referred to Dr. Nancy L. Diaz (neurologist) from St. Luke's Movement Disorder Center. (R. 542-47.)

In March 2014, Plaintiff requested from his new primary care physician, Dr. Ghazal Reihani from Coventry Family Practice, a referral for a new neurologist to treat involuntary movement disorder because of insurance issues. (R. 587-90.) In April 2014, Plaintiff sought treatment from Dr. Margery Mark, a neurologist from Robert Wood Johnson, for a second opinion on Dr. Kurlan's diagnosis. Dr. Mark's treatment notes from the examination consist of a summary of Plaintiff's medical history, his vital sign information, and a medication list. (R. 548-50.) Also in April 2014, Dr. Reihani prescribed oral steroids and a brace for Plaintiff's left forearm/elbow pain and referred him to St. Luke's Warren Balance Center for four weeks of physical therapy to improve his gait. (R. 585-86.)

In May 2014, Plaintiff began treatment with Dr. Tanya Schineller (psychiatrist) from Family Guidance Center.[7] Plaintiff complained to Dr. Schineller about involuntary left arm movements and left elbow pain. Dr. Schineller observed that Plaintiff had an erratic gait and favored his right side. (R. 561-62.)

---

[7] Plaintiff stopped treatment with Dr. Saba because of insurance issues. Dr. Saba's treatment notes through April 2014 reflect that Plaintiff continued to complaint about movement issues with his left side, including that he had problems walking, could not drive, and had to move into a one floor residence. (R. 551-57.)

In June 2014, Plaintiff sought treatment from Dr. Reihani for involuntary movements of his left arm, left leg stiffening, and gait disorder.  Dr. Reihani explained that he had spoken with Plaintiff's physical therapist, Michelle Smith, who stated that she could no longer help Plaintiff because his gait abnormalities were all due to psychiatric issues.  Plaintiff confirmed Ms. Smith's report that he was now able to run with near normal gait pattern and ambulate with a more normal gate pattern going backwards.  However, his forward ambulation continued to vary daily with hyperextension at the knee and trunk, toe or heel drag, and poor speed.  Dr. Reihani instructed Plaintiff to follow up with his psychiatrist Dr. Schineller.  (R. 581-84.)

In July 2014, Dr. Garber completed a pre-printed form opining via check box that Listing 11.14 (Peripheral neuropathies) was satisfied.  (R. 564.)

In August 2014, Plaintiff complained to Dr. Reihani about left elbow pain and was diagnosed with left lateral epichondylitis.  He was prescribed painkillers and physical therapy; he was also advised to see a pain management specialist if the pain did not subside.  (R. 578-80.)

In November 2014, Plaintiff complained to Dr. Mark about difficulty walking.  She diagnosed him with very mild left hemichorea and tics, noted that it was probably not worth prescribing medication, and instructed Plaintiff to follow up with a specialist in psychogenic movement disorders from Robert Wood Johnson.  (R. 565-67.)[8]  Plaintiff did not report any specific complaints during his annual physical exam with Dr. Reihani in November 2014.  (R. 591-95.)  In December 2014, Plaintiff again complained to Dr. Reihani about left elbow pain and was prescribed medication for fibromyalgia.  (R. 574-77.)

---

[8] Hemichorea is characterized by involuntary random-appearing irregular movements that are rapid, non-patterned, and confined to one side of the body.  *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4332132/.

In January 2015, Dr. Schineller noted that Plaintiff arrived for his appointment in a wheelchair because he was afraid of slipping on ice or snow. Dr. Schineller diagnosed Plaintiff with anxiety disorder, major depressive disorder (recurrent, mild, in remission), and psychogenic movement disorder. Like Dr. Mark, Dr. Schineller recommended that Plaintiff make an appointment with the specialist in psychogenic movement disorders from Robert Wood Johnson. (R. 568-70.)

**B.    Post-ALJ Hearing, Pre-ALJ Decision.**

At the close of the hearing on February 24, 2015, the ALJ granted a request from Plaintiff's counsel to keep the record (then consisting of Exhibits 1F through 23F) open until March 30, 2015. The request was primarily granted to accommodate Plaintiff's upcoming March 17 appointment with the specialist recommended by Drs. Mark and Schineller. (R. 121.)

On March 26, 2015, Plaintiff's counsel submitted a letter to the ALJ that included three additional exhibits. Exhibit 24F (Dr. Kurlan's statement dated October 1, 2013) and Exhibit 25F (Dr. Reihani's treatment notes from September 8, 2013 to December 8, 2014) are described above in Section IV.A.1. (R. 571-632.) Exhibit 26F was a "progress note" from Dr. Garber dated March 19, 2015, reflecting that Plaintiff returned for a follow-up exam.[9] Plaintiff complained that his condition had deteriorated over the preceding fourteen months, in that: his left hand was constantly in a fist; he was unable to stand for any length of time due to poor balance; he typically used a wheelchair outside of the house; he experienced nearly constant, painful, involuntary flexing of his left arm at the elbow; and he often spent time lying on his knees and elbows to stop the flexing. Dr. Garber observed that Plaintiff had nearly continuous choreoathetoid movements of the left

---

[9] Plaintiff's counsel advised during the hearing that Plaintiff had not seen Dr. Garber since January 2014 "because the insurance would not allow him to go back." (R. 77.)

upper arm, that Plaintiff's left hand was largely held with fingers flexed, and that Plaintiff's gait was embellished. Dr. Garber opined:

> It is difficult to conceive of a work environment in which the patient could function, given these abnormal movements. Therefore, he is totally disabled. Barring the future discovery of a treatment that would be effective for him, this disability is likely permanent.

Dr. Garber's notes reflect subsequent confirmation from Dr. Avallone that Plaintiff had lateral epicondylitis of the left elbow. Based on his review of Dr. Mark's treatment notes, Dr. Garber again opined on March 23, 2015 that Plaintiff "is totally and permanently disabled, barring the future discovery of a treatment that would be effective for his involuntary movements." (R. 633-36.) The ALJ closed the record on March 30, 2015 and issued her decision on April 19, 2015.

### C. Post-ALJ Decision.

#### 1. Dr. Schneider.

On August 13, 2015, Plaintiff's counsel added to the record as Exhibit 27F treatment notes from Plaintiff's March 31, May 19, and June 29, 2015, appointments with Dr. Daniel P. Schneider, a psychoneurologist from Robert Wood Johnson (and the psychogenic movement disorder specialist recommended by Drs. Mark and Schineller). On March 31, Dr. Schneider noted that Plaintiff had an unusual gait, abnormal movements of his left upper arm involving continuous writhing movements, and facial tics. Dr. Schneider asked Dr. Mark to examine Plaintiff again, and the two doctors agreed that Plaintiff's movement issues result from a conversion disorder. Dr. Schneider also spoke with Plaintiff's psychotherapist at Family Guidance Center. Dr. Schneider advised he did not have any contacts with providers in Plaintiff's geographic area familiar with behaviorally-informed physical and occupational therapy for conversion disorders. Dr. Schneider provided Plaintiff with website addresses that discuss conversion disorders. On May 19, Dr. Schneider urged Plaintiff to continue searching for specialty therapists and to consult the

recommended websites. On June 29, Dr. Schneider noted that Plaintiff was on the waitlist for a treatment protocol being developed for conversion disorders by therapists at Robert Wood Johnson. (R. 637-51.)

On November 2, 2015, Plaintiff's counsel provided the Appeals Council with three pre-printed forms completed by Dr. Schneider, each dated October 28, 2015. First, Dr. Schneider opined that via check box that Listing 11.04 (Central nervous system vascular accident) was satisfied. Second, Dr. Schneider opined via check box that Listing 12.07 (Somatoform Disorders) was satisfied. Third, Dr. Schneider opined on a form entitled Medical Assessment Of Ability To Do Work-Related Activities that, as of March 31, 2015, Plaintiff: could sit up eight hours a day; could never stand or walk in an eight-hour day; had no repetitive action limitations for his right hand; could not grasp, push/pull or perform fine manipulations with his left hand; and could not push/pull with his right or leg legs. Dr. Schneider handwrote "NA" in the section of the form that addressed lifting, carrying, bending, climbing, and reaching. He also handwrote "unknown" next to a question asking whether emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations. (R. 20-27.)

## 2. Dr. Viradia.

Plaintiff's counsel also provided the Appeals Council with treatment notes from Plaintiff's March 22 and April 26, 2016, appointments with Dr. Manish B. Viradia (neurologist) from Hunterdon Orthopedic Institute. Plaintiff consulted Dr. Viradia for "evaluation of episodic stroke continuation episode of stiffness in the left leg and tension in the left arm and elbow." An MRI ordered by Dr. Viradia revealed no intracranial mass effect, no extracerebral collections, and "focal defect presumably an old ischemic event along the medical surface of the right side of the thalamus." Dr. Viradia diagnosed Plaintiff with gait abnormality, movement disorder, and

secondary Parkinson disease.  Plaintiff was prescribed Baclofen (a muscle relaxant) and scheduled for follow-up visit in six months.  (R. 7-19.)

## V.    DISCUSSION

### A.    Step Three.

The ALJ found at Step Three that Plaintiff did not meet or medically equal Listing 11.14 (Peripheral neuropathy), Listing 12.04 (Affective disorders), or Listing 12.06 (Anxiety-related disorders).  Plaintiff's attack on the ALJ's Step Three findings is twofold.  First, Plaintiff contends that remand is warranted because the ALJ failed explicitly to consider Listing 12.07 (Somatoform Disorders), which applies to physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.  Second, Plaintiff contends that remand is warranted because the ALJ rejected Dr. Garber's opinion that Plaintiff satisfied Listing 11.14.

#### 1.    Listing 12.07.

The Court agrees that the potential applicability of Listing 12.07 should have been obvious from some of the medical evidence cited by the ALJ in her Step Three analysis – including, for example, records suggesting that Plaintiff's "gait abnormalities could be related to psychiatric issues" (R. 40).  *See Burnett*, 220 F.3d at 120 n.2 (holding "it is within the realm of the ALJ's expertise" at Step Three to identify closest applicable Listing).  Nevertheless, the Court finds that the omission was harmless because the ALJ's Step Three discussion permitted meaningful judicial review of the evidence as related to Listing 12.07.  *See Scuderi v. Comm'r of Soc. Sec.*, 302 F. App'x 88, 90 (3d Cir. 2008) (ALJ need not specifically mention any Listing to make judicially reviewable finding); *Williams v. Comm'r of Soc. Sec.*, 156 F. App'x. 501, 505 (3d Cir. 2005) (same); *Scatorchia v. Comm'r of Soc. Sec.*, 137 F. App'x 468, 470-71 (3d Cir. 2005) (same).

Listing 12.07 is met when the requirements of *both* paragraphs A and B are met:

A.       Medically documented by evidence of one of the following:

1.       A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or

2.       Persistent nonorganic disturbance of one of the following:
        a.       Vision; or
        b.       Speech; or
        c.       Hearing; or
        d.       Use of a limb; or
        e.       Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia); or
        f.       Sensation (e.g., diminished or heightened).

3.       Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury.

AND

B.       Resulting in at least two of the following:

1.       Marked restriction of activities of daily living; or

2.       Marked difficulties in maintaining social functioning; or

3.       Marked difficulties in maintaining concentration, persistence, or pace; or

4.       Repeated episodes of decompensation, each of extended duration.

Social Security Administration Program Operations Manual System ("POMS"), DI 34132.009,

*Mental Listings from 12/18/07 to 09/28/16*, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0434132009 (last visited on August 31, 2018). [10]

The paragraph B criteria for Listing 12.07 are identical to the paragraph B criteria

considered by the ALJ in analyzing Listings 12.04 and 12.06. As to the latter Listings, the ALJ –

---

[10] Plaintiff's reliance on the currently applicable Listing 12.07 criteria is misplaced, because the Court – like the ALJ – is required to apply all Listings in effect on April 4, 2012, when Plaintiff filed his DIB claim.

and DDS – found that Plaintiff had a mild limitation as to daily living activities; a moderate limitation as to each social functioning and concentration, persistence, and pace; and no repeated episodes of compensation, each of an extended duration.  (R. 41.)  The ALJ specifically found that Plaintiff:  went out; shopped; made attempts to clean the house; cared for himself and his 9-year-old son when his son stayed with him on weekends; drove during at least some part of the relevant period; had a good appetite; was able to sleep; was routinely described as friendly, pleasant, cooperative, and calm; had good eye contact, normal speech and full range affect; had relationships with his family and alleges no difficulties in that regard; had intact concentration; was typically described as coherent and logical; and had normal speech and thought content without hallucinations or delusions.  (R. 41, 48.)

Plaintiff summarily urges that Listing 12.07 is satisfied because:

[T]he ALJ did not even discuss the evidence indicating [Plaintiff] potentially met Listing 12.07, warranting remand.  [Plaintiff] has marked/severe impairments in activities of daily living due to his physical/psychological limitations in standing, walking and moving about; he has OCD with ritualistic behaviors which make it difficult for him to start and complete tasks or to be on schedule; his panic attacks are unpredictable and he will not be able to function during an episode; he is uncomfortable sitting and is constantly shifting positions; and his arms and legs exhibit writhing, tremoring, twitching and he has facial grimaces and tics.

ECF No. 20 at 16-17 (citing R. 337, 341, 343, 345, 373, 375, 377, 459, 463, 478-79, 486, 490, 525, 567, 567).  However, Plaintiff does not dispute the ALJ's findings that Plaintiff could perform daily activities notwithstanding limitations involving the left side of his body.  As to social functioning and concentration, persistence, and pace, the ALJ considered earlier evidence in the record referencing Plaintiff's "irritability/agitation and labile affect;" cited evidence indicating that Plaintiff's OCD and panic disorders were "more episodic" since the initial diagnoses in 2010  and "largely resolved" since December 2011; and considered Plaintiff's testimony that he was "doing better" on his mental health medications and could "focus to read and watch television if he gets

himself physically comfortable." (R. 41, 44, 47.) Simply put, Plaintiff points to no evidence that would support a finding of a marked limitation in one, let alone two, of the paragraph B functional categories as required to satisfy Listing 12.07. *See Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x. 810, 814 (3d Cir. 2016) (deficiency in Step Three analysis is harmless error if claimant "offers no explanation of how further analysis could have affected the outcome of his disability claim"). The Court therefore finds that the ALJ's failure to discuss Listing 12.07 at Step Three does not warrant remand.

### 2. Listing 11.14.

Plaintiff also argues that the ALJ erred by giving "little weight" to Dr. Garber's July 2014 opinion that Plaintiff satisfied Listing 11.14 (peripheral neuropathy). (R. 46, 48.) Listing 11.14 requires "disorganization of motor function as described in 11.04B, in spite of prescribed treatment." POMS, DI 34131.01, *Neurological Listings from 12/15/04 to 09/28/16*, available at https://secure.ssa.gov/poms.nsf/lnx/0434131013 (last visited on August 31, 2018). Listing 11.04B requires "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (*see* 11.00C)." *Id.* Listing 11.00C provides:

> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands and arms.

*Id.*

When evaluating medical evidence, an ALJ must give controlling weight to, and adopt the medical opinion of, a treating physician if it "is well-supported by medically acceptable clinical

and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000) (treating physician rule is "cardinal principle" guiding disability determinations). "[A]n ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317. Moreover, even where the treating physician's medical opinion is not required to be given controlling weight, the opinion still may be entitled to deference based on the ALJ's consideration of the following factors: length of treatment relationship, frequency of examination, nature and extent of the treatment relationship, relevant evidence used to support the opinion, consistency of the opinion with the entire record, and the expertise and specialized knowledge of the source. 20 C.F.R. § 404.1527(c)(2)-(6); *see Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (ALJ "may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided") (citing 20 C.F.R. § 404.1527(c)(3)).

Dr. Garber's "opinion" that Plaintiff satisfied Listing 11.14 consisted of a pre-printed document with checkboxes next to verbatim recitations of the referenced Listings. The ALJ assigned little weight to this "opinion" because Dr. Garber's treatment notes offer the contradictory evidence "that the involuntary movement abnormality was of 'unclear etiology'." (R. 46; *see* R. 48 ("it is actually unclear from the record whether the claimant had central nervous vascular accident and/or whether the involuntary movements are due to such").) Plaintiff complains that:

> [B]y shifting the focus to uncertainty as to the precise cause of [Plaintiff's] functional problems, the ALJ has essentially discounted them regardless of their cause – minimizing the evidence that they have a primarily physical original because of indications they have a significant psychiatric component, while also failing to properly evaluate the psychiatric component. This is untenable.

ECF No. 20 at 19. However, the ALJ's focus on the cause of Plaintiff's abnormal movements is appropriate, because Listing 11.14 requires "cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction." The Court therefore finds that the ALJ's weighing of Dr. Garber's opinion as to Listing 11.14 was supported by substantial evidence.

**B.      Plaintiff's Subjective Complaints.**

An ALJ is required to assess the credibility of a claimant's subjective complaints using a two-step process. First, the ALJ must determine whether the record demonstrates that the plaintiff possesses a medically determinable impairment that could reasonably produce the alleged symptoms. Second, the ALJ must assess the credibility of the plaintiff's complaints regarding the intensity of the symptoms. To do this, the ALJ must determine if objective medical evidence alone supports the plaintiff's complaints; if not, the ALJ must consider other factors, including: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the pain; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms, (6) any other measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. § 404.1529.

Here, the ALJ found that Plaintiff's medically determinable impairments reasonably could have been expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms was not entirely credible. (R. 44.) Plaintiff argues that this assessment was not supported by substantial evidence because the ALJ both "focused unduly on the medical evidence" without adequate consideration of additional

factors and "fail[ed] to adequately evaluate the complex relationship between the physiological and psychiatric components of [Plaintiff's] symptoms." ECF No. 20 at 21-22; *see* ECF No. 26 at 3-4. The Court agrees.

The ALJ concluded that, "[t]o the extent that the claimant has gait abnormalities and involuntary movements due to left hemichorea, Tourette's syndrome and a psychogenic movement disorder, he is partially credible and is thus limiting [sic] to a reduced range of light exertion." (R. 46.) However, the ALJ's assessment of Plaintiff's credibility almost exclusively focused on medical evidence regarding Plaintiff's gait and not his involuntary movements, which the ALJ found to be "the most acute of all of the claimant's symptoms." (R. 44.) The ALJ did not discuss, for example, the medical evidence in which Plaintiff's treating physicians observed involuntary movements of his left upper and/or lower extremities. This includes emergency room physicians in January 2012, Dr. Saba throughout 2012 and 2013, primary care physicians in August 2012, and Dr. Garber in March 2013 and March 2015.[11] As to Plaintiff's gait abnormalities, the ALJ highlighted isolated records in which Plaintiff's treating physicians observed a normal gait without mention of records reflecting observations of abnormal gait. Similarly, the ALJ did not mention Dr. Radzin's report as consultative examining physician that Plaintiff presented in an exceedingly "shaky" state and could not get himself to Dr. Radzin's second floor office. Nor did the ALJ

---

[11] Plaintiff complains that the ALJ erred by giving "little weight" to Dr. Garber's March 2015 opinion that Plaintiff was totally disabled by his abnormal movements. (R. 46.) A treating physician "opinion" that a claimant is disabled and unable to work can never be given controlling weight, because that is an administrative finding reserved to the Commissioner. 20 CFR §§ 404.1527(d), 416.927(d); *see* Social Security Ruling 96-5p, *Policy Interpretation Ruling Titles II and XVI: Medical Source Opinions On Issues Reserved To The Commissioner*, 1996 WL 374183, at *5 (S.S.A. Jul. 2, 1996), *rescinded by* 82 Fed. Reg. 15263 (Mar. 27, 2017). However, the ALJ is not precluded from weighing Dr. Garber's underlying observation that Plaintiff "had nearly continuous choreoathetoid movements of the left upper arm" when examined in March 2015.

reconcile Dr. Garber's notation of Plaintiff's "embellished" gait with the medical evidence reflecting that Plaintiff's movement issues resulted from psychiatric issues.

On remand, the ALJ must clarify why Plaintiff's subjective complaints regarding the limitations imposed by his gait abnormalities and involuntary movements are not entitled to great weight.

## C.    Plaintiff's Father's Testimony.

The ALJ's discussion of the testimony provided by Plaintiff's father during the hearing consists of the following paragraph:

> The claimant's father also testified at the hearing. He stated that his son has had tics and twitches all his life. The claimant had friends and was very intelligent, but had some social difficulties. The claimant stated that he lives in Florida and sees his son once or twice a year or if needs to come up and assist. [sic] He talks to him two times a week. The claimant's father noted that his son's condition has gotten worse and that he has an ungainly gait. The claimant has had tremors since child that were unclear as to cause. In 2010-2011, Mr. Hendry noticed that his son had a lot of anger related to the divorce and that when he stopped working in 2011, the claimant's condition was far worse physically in terms of difficulty walking and use of his arms need to stretch his arm) (Hearing Testimony).

(R. 44.)  Plaintiff argues that the ALJ erred in assessing this evidence. The Court agrees.

The Third Circuit instructs that an ALJ is free to "discount" lay witness testimony but must explain the reasons for doing so. *Fargnoli*, 247 F.3d at 43; *see Burnett*, 220 F.3d at 122 (ALJ must evaluate credibility of and ascribe weight to lay testimony); *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983) (same).  Contrary to Defendant's argument that the ALJ "assessed significant physical and mental limitations based on the totality of the record, including the father's testimony" (ECF No. 21 at 12 (citing R. 44-49)), the ALJ's brief summary of Mr. Hendry's testimony offers no clue as to whether or what extent that testimony was incorporated into the RFC determination.  Remand is warranted because the Court cannot meaningfully review this aspect of the ALJ's decision. *See Wolk v. Colvin*, No. 2:15-cv-02478 (CCC), 2017 WL 1293015, at *6

(D.N.J. Apr. 5, 2017) (remanding for ALJ's failure to evaluate and weigh of lay testimony); *Del Valle v. Comm'r of Soc. Sec.*, No. 12-cv-7930 (RMB), 2014 WL 546111, at *10 (D.N.J. Feb. 10, 2014) (same).[12]

### D.     Steps Four And Five.

Plaintiff contends that "it cannot be found the ALJ met the Commissioner's burden at step five" to "show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her[/his] medical impairments, age, education, past work experience, and residual functional capacity."  ECF No. 20 at 24-25 (quoting *Plummer*, 186 F.3d at 428).  The Court notes that the only alleged errors about which Plaintiff complains in this section of his briefing involve the ALJ's RFC determination at Step Four – where the burden of proof rests with Plaintiff.  *See McGee v. Comm'r of Soc. Sec.*, No. 08-cv-594 (FLW), 2014 WL 2618541, at *9 (D.N.J. Jun. 12, 2014) (citing *Wallace v. Sec'y of Health and Human Svcs.,* 722 F.2d 1150, 1153 (3d Cir. 1983)).  Specifically, Plaintiff argues that "the ALJ's residual functional capacity assessment cannot be sustained" because the ALJ erroneously weighed Dr. Garber's opinion regarding Listing 11.14, erroneously assessed Plaintiff's credibility as to his subjective complaints, and erroneously evaluated the testimony of Plaintiff's father.  ECF No. 20 at 25 (citing reasons "demonstrated above").  In light of the Court's findings above, the Court finds that remand is warranted for a new RFC determination that properly assesses Plaintiff's credibility and his father's testimony

---

[12] The Court also rejects Defendant's argument, asserted without citation to any authority, that the ALJ's failure to evaluate and weigh Mr. Hendry's testimony was harmless error because Plaintiff "fails to identify any additional limitations he believes the testimony established."  ECF No. 12 at 12.  In *Burnett*, the Third Circuit rejected an analogous argument that lay witness testimony mirroring claimant's testimony is not outcome-determinative and thus need not be weighed by the ALJ.  *Id.*, 220 F.3d at 122 (error was not harmless because lay witness testimony can bolster claimant's credibility); *accord Mantell v. Berryhill*, No. 3:17-cv-00128, 2018 WL 3060087 (M.D. Pa. May 30, 2018), *report and recommendation adopted by* 2018 WL 3060037 (M.D. Pa. Jun. 20, 2018).

E.      **Additional Evidence.**

Plaintiff contends that remand is required for the ALJ to consider three categories of additional evidence:  treatment notes from Plaintiff's March 31, May 19, and June 29, 2015, appointments with Dr. Schneider; Dr. Schneider's opinions regarding Listing 11.04 (Central nervous system vascular accident), Listing 12.07 (Somatoform Disorders), and Plaintiff's functional limitations; and treatment notes from Plaintiff's March 22 and April 26, 2016 appointments with Dr. Viradia.[13] When a claimant seeks to rely on evidence that was not presented to the ALJ, a district court may remand the case if the claimant can demonstrate that such evidence is new and material, and that good cause exists for not presenting the evidence to the ALJ in a timely manner.  *See Matthews v. Apfel*, 239 F.3d 589, 592-92 (3d Cir. 2001).  The Court finds that remand is warranted as to the additional evidence from Dr. Schneider, but not from Dr. Viradia.

The Court agrees with the parties that all of Dr. Schneider's evidence is new because it was prepared after the ALJ issued her decision and could not have been presented before the record closed.  *See Szubak v. Sec'y of Health and Human* Services, 745 F.2d 831, 833 (3d Cir. 1984).  The Court also agrees with Plaintiff's argument (undisputed by Defendant), that the Declaration submitted by Plaintiff's counsel sets forth good cause for not previously submitting this evidence to the ALJ.  *See* ECF No. 20-1 (declaration from Plaintiff's counsel detailing efforts to schedule

---

[13] On October 7, 2016, the Appeals Council denied Plaintiff's request for review of the ALJ's decision and advised:

> We also looked at evidence from Manish B. Viradia, M.D., dated March 22, 2016 to April 26, 2016 (14 pages) and Daniel P. Schneider, M.D., dated October 28, 2015 (8 pages).  The Administrative Law Judge decided your case through May 15, 2015.  This new information is about a later time.  Therefore, it does not affect the decision about whether you were disabled on or before May 15, 2015.

(R. 2.)  The Appeals Council does not appear to have considered Exhibit 27F (treatment notes from Plaintiff's March 31, May 19, and June 29, 2015, appointments with Dr. Schneider), which was added to the administrative record by Plaintiff's counsel on August 15, 2015.

Plaintiff's appointments with Dr. Schneider and obtain associated records). The Court further agrees with Plaintiff that Dr. Schneider's evidence is material. As a threshold matter, this evidence "relate[s] to the time period for which benefits were denied" (i.e., December 7, 2011 through May 15, 2015) because Dr. Schneider opined that Plaintiff satisfied Listings 11.04 and 12.07, respectively, as of 2011 and March 31, 2015. *Szubak*, 745 F.2d at 833. Moreover, "it cannot be said that there is no possibility that [Dr. Schneider's evidence] would have changed the outcome of the [ALJ's] decision." *Id.*; *see Newhouse v. Heckler*, 753 F.2d 283, 287 (3d Cir. 1985) (materiality standard for new evidence on Sentence Six remand is "not great" and need not satisfy preponderance test). Dr. Schneider is a physician who practices in an extremely specialized field (psychoneurology) and treated Plaintiff for at least a year, and his treatment notes and functional limitations opinion appear to corroborate Plaintiff's subjective complaints regarding the severity of his abnormal movements. Such evidence is plainly "probative of [Plaintiff's] disability status" and should be considered on remand. *Gross v. Comm'r of Soc. Sec.*, 653 F. App'x 116, 122 (3d Cir. 2016).

Finally, neither party's briefing – including supplemental briefs requested by the Court specifically to address the additional evidence – references Dr. Viradia's records. Accordingly, the Court finds that this evidence is not material and thus should not be considered on remand.

## VI. CONCLUSION

The concluding paragraph to each of Plaintiff's briefs "seeks a reversal of the Commissioner's decision under sentences four and six of 42 U.S.C. § 405(g) and remand with instructions to award benefits or with instructions to [conduct further proceedings]." ECF Nos. 20 at 25, 26 at 6, 33 at 8, & 35-1 at 4. The Court cannot conclude at this time that substantial evidence on the record as a whole indicates that Plaintiff is disabled and entitled to benefits. For the reasons

explained in this Opinion, the Court remands the case to the Commissioner pursuant to Sentences Four and Six of 42 U.S.C. § 405(g) for further proceedings in accordance with the preceding instructions and the accompanying Order. *See Gross*, 653 F. App'x at 122 (ordering further proceedings consistent with opinion finding remand warranted under Sentences Four and Six).

Dated:    September 26, 2018                         _____s/ Paul A. Zoss_____
At Newark, New Jersey                         PAUL A. ZOSS, U.S.M.J.